# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs February 25, 2014 at Knoxville

## STATE OF TENNESSEE v. DESHUNDRIC DENNIS

### Appeal from the Criminal Court for Shelby County
### No. 11-02198     L.T. Lafferty, Judge

### No. W2012-02236-CCA-MR3-CD  -  Filed March 28, 2014

The defendant, Deshundric Dennis,[1] appeals his Shelby County Criminal Court jury conviction of aggravated assault, for which he received a three-year Range I sentence. On appeal, the defendant challenges the sufficiency of the convicting evidence. Discerning no error, we affirm.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the Court, in which JOSEPH M. TIPTON, P.J., and D. KELLY THOMAS, JR., J., joined.

Phyllis Aluko (on appeal), and Michael Johnson (at trial), Assistant District Public Defenders, for the appellant, Deshundric Dennis.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Kate Edmonds, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

At trial, the victim, Tresa Triplett,[2] testified that on October 14, 2010, she went to the home of her fiance's mother, Carolyn Hawkins, to retrieve the cord to her computer.

---

[1]The defendant's first name is spelled "Deshundric" in the indictment, but the defendant testified that his first name is spelled "Deshundrick." As is the policy of this court, we utilize the spelling contained in the indictment.

[2]The victim's first name is spelled "Teresa" in the indictment, but she testified at trial that her first name is spelled "Tresa." We will honor the spelling provided by the victim at trial.

When she arrived, she looked through the storm door and saw the defendant, her fiance's brother, sitting "to the left of the den" inside the home. She then went inside and picked the cord up from the table. She said that she heard the defendant "mumbling" and recalled that he "just had a look like a 'don't mess with me' look.'" She left the house without speaking to the defendant. While in the driveway getting into her vehicle, the victim heard the defendant call out her name and call her a "b[****]." The victim said that she and the defendant had not had any previous disagreements in the entire five and one half years that she had been dating the defendant's brother.

Disturbed by the defendant's behavior, the victim telephoned Ms. Hawkins and told her that the defendant had "flipped out" and related her interaction with the defendant. According to the victim, Ms. Hawkins said that she "was tired of it, and she was going to the house." The victim said that she warned Ms. Hawkins not to go to the house alone, and the two women made plans to meet at the house later. Before going to Ms. Hawkins' residence, the victim spoke with Ms. Hawkins on the telephone, and during that conversation, she "heard like breaking of glass and . . . someone talking loud . . . in an angry kind of state."

When the victim arrived at the appointed time, she saw Ms. Hawkins standing in the driveway. After "a minute or two," the defendant came out of the house and put some items into his car. When the defendant saw the victim, he said, "'I'm going to kill that "B,"'" and began walking toward the victim. The victim, who had not yet exited her vehicle, recalled that the defendant "was just kind of raving" and walking toward her car. When she "saw his arm go up" and heard a gunshot, she "put the car in reverse and proceeded in getting away from that location." Ms. Hawkins screamed, "'Run, Tresa.'" The victim said that the gunfire continued as she drove away from the residence. The victim said that she was "[j]ust scared" during the ordeal.

During cross-examination, the victim agreed that the defendant was in an agitated state when she first arrived at Ms. Hawkins' residence. She admitted that the defendant did not threaten her at that time. She said that she telephoned Ms. Hawkins to warn her that the defendant "was in one of those states that [the victim had] only heard about [but] never seen." She acknowledged that the defendant could "[p]robably" tell that the two women were talking about him in the driveway. The victim equivocated when asked if she actually saw the defendant in possession of a weapon, saying, "I couldn't say, no, I couldn't say that I saw it because I heard the fire." She conceded that no bullets struck her car. She said that she did not look back as she drove away from the house.

During redirect examination, the victim admitted that she told police officers that the defendant "'pulled the gun out and shot it down.'"

Carolyn Hawkins testified that the victim telephoned her on October 14, 2010, and that their conversation prompted Ms. Hawkins to return to her residence. When she arrived, she noticed "some confusion going on." She said that she asked the defendant what was going on and that "he just sort of like went into a rage . . . and started tearing . . . pictures off the wall and stuff." Ms. Hawkins said that she went outside and saw the victim pulling into the driveway. Ms. Hawkins said she told the victim to leave because the defendant had been "saying what he was going to do to her." She said, "Well, he stated that 'I'm going to kill this "B,"'" you know." After Ms. Hawkins told the victim to leave, the defendant came "out the door and he was walking toward her truck." As the victim backed out to leave, Ms. Hawkins saw the defendant with a gun, "shooting down the street, the direction that the truck went." She said that she saw the defendant take the gun from his pocket and fire it four or five times.

During cross-examination, Ms. Hawkins said that by the time the defendant pulled the gun, he was close enough to the victim's vehicle to open the door and shoot the victim "if he had wanted to." She said that he did not point the gun at the victim or at her vehicle.

Memphis Police Department ("MPD") Officer Charles Cathey testified that he collected four nine millimeter shell casings from Ms. Hawkins' driveway. MPD Officer Russell Cathey testified that he conducted a traffic stop of a vehicle in which the defendant was a passenger, and during a search of that vehicle, he discovered a High Point nine millimeter handgun in the trunk. The defendant claimed ownership of the weapon.

At the conclusion of this testimony, the State rested. After a full *Momon* colloquy, the defendant elected to testify.

The defendant testified that on October 14, 2010, he was asleep in a chair in the living room after having been "up all night." At some point, he said, "[a] male figure came in" and "slammed the top of the washing machine," waking the defendant. After this happened a second time, the defendant "took a shower and went to the bank." The defendant said that he was "really not sure" whether he had come in contact with the victim on October 14, 2010, saying, "It was someone who appeared to be her. It was her truck but I'm not for sure if it was her, though. . . . Like I say, the person who came in, the preliminary, I'm not even sure that was her." Upon further questioning, the defendant denied having any contact with the victim on October 14, 2010, and claimed that he did not even see the victim on that day. He also denied having threatened her in any way. He said, "I never did that. If I would have did that, me and my brother would have had an altercation a long time ago."

The defendant again said that he saw the victim's vehicle being driven by

someone, but he claimed that he was not sure that the driver was the victim. He also admitted firing his gun at the vehicle. He said that he fired the gun as a result of "a confrontation" he had with a "male figure" inside his mother's home earlier in the day. He attempted to explain,

> I thought it was my brother, but I'm not really sure. Like I say, it's been a lot of strange things happening over the last few years. I'm really not sure that was him.
>
> But a male figure did come in and me and him had some words. It was nothing . . . . 'Cause, like I say, there's a lot of strange things that had been happening. So, I wasn't really sure it was him, but it sounded like him.

The defendant said that after the "altercation" with the "male figure," he got into the shower. When he got out, he saw his mother in the residence, but he claimed that he "really wasn't sure that that was her, 'cause the way that she approached me, she's never approached me in this type of manner before." He said that his mother told him to remove his belongings from her house. The defendant said that the glass in a picture frame broke when he and Ms. Hawkins struggled over a photograph of the defendant's son.

The defendant testified that as he transferred his belongings to his car, he saw a brown Dodge Durango pull into the driveway. He said that he was not sure that the victim was in the vehicle "'cause she's dark-skinned, and the person in the truck was kind of light-skinned." He added, "And the male figure was with her, and they was at the end of the driveway talking. . . . [T]he male figure said something to me, which I didn't respond." The defendant characterized the testimony of Ms. Hawkins and the victim that they were alone in Ms. Hawkins' yard as "a blatant lie." He said, "They just came in and lied under oath. Like I say, . . . I don't have nothing to hide. Like I say, I was charged with the handgun."

The defendant insisted that he had "seen the person in the truck insert a clip in the gun" and claimed that he "thought this other figure was going next door to get a gun." He said, "It's a house directly next door. The truck was sitting at the end of the driveway, my back was turned, and I fired two shots in the ground next to the male figure to let him know I wasn't going to . . . attempt to get no guns. She got one . . . ." The defendant maintained that he fired only two shots, then he stated that he actually fired a third shot at the feet of the "male figure" as "a warning."

During cross-examination, the defendant said that he could not be sure that the "male figure" who entered Ms. Hawkins' residence and slammed the washing machine lid

-4-

early on the morning of October 14, 2010, was his brother because "people play a lot of games" and "[p]eople wear voice modifiers, try to use other people's voices." He said that although he and the "male figure" were "close to close," he could not get "a clear picture" to discern whether the figure was his brother. Of the "male figure" he saw outside with the victim, the defendant said, "It was somebody, I was supposing it was . . . my brother, but it wasn't my brother, though. Like I said, once again, it wasn't him."

The defendant admitted that he did not stay to speak with police officers, explaining, "I don't really trust the police, 'cause like I say, I got stuff . . . in my package, trying to have me involved in a burglary, and I never burglarized anything in my life, so I . . . don't even trust the police. I left." He denied that he fled the scene, however, saying that he "left to do what [he] was in the process of doing." The defendant then claimed that he did stay until police arrived and that he "walked right past the police" as he left Ms. Hawkins' residence. He insisted that the police "let [him] keep walking."

Based upon this proof, the jury convicted the defendant as charged of the aggravated assault of the victim.

On October 28, 2011, the trial court imposed a three-year, Range I sentence to be served in confinement and awarded the defendant pretrial jail credit from his arrest on October 14, 2010, to October 28, 2011. The defendant filed a timely but unsuccessful motion for new trial, and the trial court appointed the public defender's office to represent the defendant on appeal.

In this appeal, the defendant challenges the sufficiency of the convicting evidence. Specifically, he claims that, because of his mental state at the time, the State failed to establish that he acted intentionally or knowingly. He also claims that because the evidence established that he did not actually aim at the victim when firing, her fear was not reasonable.

We review the defendant's claim mindful that our standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

When examining the sufficiency of the evidence, this court should neither re-weigh the evidence nor substitute its inferences for those drawn by the trier of fact.

*Winters*, 137 S.W.3d at 655. Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Significantly, this court must afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Id.*

As charged in this case, "[a] person commits aggravated assault who . . . [i]ntentionally or knowingly commits an assault as defined in § 39-13-101, and [u]ses or displays a deadly weapon." T.C.A. § 39-13-102(a)(1)(A)(ii) (2006). For purposes of this case, "[a] person commits assault who . . . [i]ntentionally or knowingly causes another to reasonably fear imminent bodily injury." *Id.* § 39-13-101(a)(2).

Both the victim and Ms. Hawkins testified that the defendant cursed the victim, threatened to kill her, and then fired a handgun in the direction of her vehicle as she fled the scene in fear. Although the defendant claimed that he did not threaten the victim and that he fired shots into the ground only as a "warning" to the "male figure" who appeared to be the defendant's brother but was not actually his brother, the jury was free to disregard this bizarre testimony. In our view, the testimony of the two women sufficiently established that the defendant intentionally or knowingly caused the victim to reasonably fear imminent bodily injury.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE